# EXHIBIT D



# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("Agreement") is made and entered into this 29 day of October 2021, by and between Mercer Global Advisors Inc., a Delaware corporation (hereinafter "Employer"), and Travis Weitz (hereinafter "Employee"), and will become effective on Employee's first day of employment, which shall be November 1, 2021 (the "Start Date").

## ARTICLE I: EMPLOYMENT

1.1   <u>Employment</u>:  Employer agrees to employ the Employee and the Employee agrees to be employed upon the terms and conditions set forth in this Agreement, the Restrictive Covenant Agreement, Employer's Employee Handbook, and Employer's policies and procedures. Employer reserves the right to amend (including additions and deletions) its Employee Handbook and policies and procedures at any time, in its sole discretion.  In the event of any conflict between this Agreement and the Employee Handbook or any policy or procedure, this Agreement shall control.

1.2   <u>At-Will Employment</u>:  The Employee's employment with Employer shall be for an unspecified term and is at-will. Subject to any notice requirements set forth in Employer's Restrictive Covenant Agreement executed by Employee, either party may elect to terminate the employment relationship at will, at any time, for any reason, with or without cause. Employee acknowledges that Employer has made no representations regarding any minimum or specified term or length of employment.

1.3   <u>Duties</u>:  Employee's job title shall be Senior Portfolio Manager. Some of the duties of Employee's position are set forth in Exhibit A to this Agreement. Employee's job title, duties, and any job description that describes Employee's duties and responsibilities may be revised at any time, in Employer's sole discretion. Employee shall loyally, conscientiously, and professionally do and perform all duties and responsibilities assigned by Employer and the Employee's supervisors.

1.4   <u>Exclusive Services</u>:  Employee shall devote their full working time, abilities, and energies to Employer's business and shall use their best efforts, skills, and abilities to promote the general welfare and interest of Employer. Employee shall not, directly or indirectly, render any services of a business, commercial, or professional nature to any other person, firm, or organization, whether for compensation or otherwise, while employed by Employer unless Employer first consents in writing.

1.5   <u>Compliance with Laws and Policies</u>:  Employee shall comply with all laws and regulations, Employer's Employee Handbook, and Employer's policies and procedures.  Employer reserves the right to amend (including additions and deletions) its Employee Handbook and policies and procedures at any time, in its sole discretion. Employee shall not engage in any activity or behavior that may adversely affect the business reputation of Employer.

1.6   <u>Corporate Opportunity</u>:  Employee acknowledges and agrees that all opportunities and business relating in any way to Employer's business ("Corporate Opportunity") that are created or discovered by Employee belong to Employer, and Employee will notify Employer of each and every Corporate Opportunity in a timely manner.

1

1.7 <u>Employee Work Product</u>:  For purposes of this section 1.8, "Employer" shall include Employer and all Affiliated Companies.

    1.7.1 Affiliated Companies: The term "Affiliated Companies" also shall include any company that may at any time be commonly owned or controlled by, affiliated with, or a subsidiary or parent of, Employer.

    1.7.2 Employee acknowledges and agrees that all documents, material, work, discoveries, patents, trademarks, copyrights, intellectual property, inventions, or improvements (collectively "Work Product") made or created by Employee during their employment is the sole and exclusive property of Employer and/or constitutes a "work for hire."

    1.7.3 Employee acknowledges and agrees that any Work Product made by Employee during Employee's employment shall belong to Employer, and Employee hereby assigns all right, title, and interest in and to any such Work Product to Employer. Employee shall execute any assignments or other documents and, at the expense of Employer, take such other actions as Employer reasonably may require in order to perfect or protect Employer's ownership or title to any such Work Product.

    1.7.4 Employee expressly agrees and acknowledges that Employer's ownership of the Work Product is absolute, and that Employer shall have the right to transfer, assign, sell, license, or otherwise exploit the Work Product, and any and all derivative or related works, without further payment to or compensation of Employee.  Employee further agrees that, in the event that a court of competent jurisdiction subsequently determines that notwithstanding the foregoing language, Employee retains any right, title, or interest in or to the Work Product, Employee irrevocably agrees to sell, transfer, and assign any and all such right, title, or interest to Employer, immediately upon Employer's request, for the sum of ten dollars ($10).

## ARTICLE II:  COMPENSATION

2.1 <u>Wages</u>:  Employer shall pay Employee, and Employee shall accept from Employer, as payment in full for Employee's services, the compensation set forth in Exhibit B to this Agreement.  Employer may modify Employee's compensation at any time, in its sole discretion.  Compensation shall be paid in accordance with Employer's existing pay practices, which may be modified at any time, in Employer's sole discretion.

2.2 <u>Payment Upon Termination</u>:  If either Employer or Employee exercises the right to terminate the employment relationship, Employer shall be obligated to pay the Employee only that compensation earned by the Employee as of the date of termination.

2.3 <u>Disputed Compensation</u>:  If Employee has any grievance or dispute regarding the amount of compensation owed under this Agreement, Employee must notify Employer in writing of the grievance or dispute within ninety (90) days of the date Employee knew or should have known of the grievance or dispute. Employee hereby waives any grievance or dispute raised after the expiration of this 90-day period.

## ARTICLE III:  RESTRICTIVE COVENANT AGREEMENT

3.1 <u>Execution of Restrictive Covenant Agreement</u>:  Employee agrees that as a condition of their employment, they shall execute Employer's Restrictive Covenant Agreement contemporaneously with this Agreement.  Because of the special, unique, unusual, extraordinary, and intellectual character of Employer's Confidential Information, this Employment Agreement shall not be effective, and no employment relationship shall be formed, unless and until Employee executes Employer's Restrictive Covenant Agreement.

3.2    <u>Survival of Restrictive Covenant Agreement</u>:  Employee agrees that the covenants in the Restrictive Covenant Agreement shall survive termination of Employee's employment with Employer and this Agreement.

### ARTICLE IV:  EMPLOYEE REPRESENTATIONS AND WARRANTIES

4.1    <u>Correct Information</u>:  Employee represents that information provided by Employee in their resume and application is true and correct and contains no material omissions.

4.2    <u>Prior Agreements</u>: Employee represents and warrants that, (1) as of the Start Date and during Employee's employment with Employer, Employee will not possess any material, tangible, confidential or proprietary information, including documents, files, disks, or other data, belonging to Employee's former employer or its affiliates; (2) as of Employee's Start Date, Employee has not solicited any employees or clients of Employee's former employer or its affiliates to change their association with Employee's former employer or its affiliates; and (3) Employee is not subject to any restrictive covenant, notice of termination requirement, non-competition or non-solicitation provision with any former employer or any agreement that prevents Employee from entering into employment by Employer, and that Employee has conducted a due diligence review of copies of all agreements Employee may have entered into with Employee's former employer to ensure that the foregoing representation and warranty is correct.

### ARTICLE V:  MISCELLANEOUS

5.1    <u>Interpretation</u>:  This Agreement shall be construed and enforced to the maximum extent permitted by law.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be valid and effective under applicable law. If any provision of this Agreement is found by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement will not be affected by any such finding, and such provision shall be construed and/or modified to the extent necessary to render the provision valid and enforceable, or shall be deemed excised from the Agreement.  The provisions and remedies in this Agreement are independent and cumulative, and Employer (and any Affiliated Company, if applicable) has the right, in its sole discretion, to enforce or pursue any remedy for a breach of one, some, or all of the provisions of this Agreement.

5.2    <u>Allowable Remedies</u>:  Each party shall be entitled to pursue all remedies including, but not limited to, legal and equitable remedies against the other party for any breach of this Agreement.

5.3    <u>Inurement and Assignment</u>:  The provisions of this Agreement shall be binding on the Employee and shall inure to the benefit of the successors and assigns of Employer. Employer may assign this Agreement to any successor employer or other entity at any time, in its sole discretion and without Employee's consent.  Employee may not assign their rights, duties, or obligations in this Agreement without the express written consent of the Chief Executive Officer of Employer.

5.4    <u>Titles and Headings</u>:  Titles and headings in this Agreement are for reference purposes only and do not limit or alter the content of the Agreement in any respect.

5.5    <u>Entire Agreement</u>:  This Agreement (with its Exhibits) and the Restrictive Covenant Agreement constitute the entire agreement and understanding between the parties and supersede any and all other agreements, communications, understandings, or promises, whether oral or in writing, or express or implied, between Employer and Employee with respect to the subject matter hereof, including, but not limited to, any implied-in-law or implied-in-fact covenants or duties relating to employment. No amendment or modification of either Agreement shall be valid or binding unless the same shall be in writing and signed by the Employee and an authorized executive of Employer.

5.6 <u>Waiver</u>:  A waiver by Employer of a breach of any provision of this Agreement by Employee shall not operate or be construed as a waiver or estoppel of any subsequent breach by Employee. No waiver shall be valid unless in writing and signed by the Chief Executive Officer of Employer.

5.7 <u>Notices</u>:  Any notice required or desired to be given under this Agreement shall be deemed given if in writing and sent by certified mail to Employee at Employee's residence of record with Employer or to Employer at its present headquarters in Denver, CO, addressed to the personal attention of the Director of Human Resources and copied to the General Counsel of Employer.

5.8 <u>Valid Agreement</u>:  Each of the Parties to this Agreement represents and warrants that this agreement is valid, binding, and enforceable, is supported by adequate consideration, and further agrees that it is not unlawful nor is it unconscionable in any respect.

[Signatures on next page]

**ACKNOWLEDGMENT BY EMPLOYEE**

Employee acknowledges that he has carefully read this Agreement, knows its contents, and knows that it contains a waiver of some of his rights.  Employee further acknowledges that he either has been represented by independent counsel who has explained to him the meaning and legal consequences of this Agreement or has determined not to obtain such independent counsel after being advised to do so by Employer and after having been given sufficient time to obtain such counsel.

IN WITNESS WHEREOF, the parties hereto affix their signatures and acknowledge that they have read and understand this Agreement and agree to be bound by its terms.

Employee

*/s/ Travis Weitz*
88D9B1CAD8A8424...
Travis Weitz

10/29/2021

Date

Mercer Global Advisors Inc., Employer

By: *Samantha Elder*
4EA6F89BBEC54E2...

10/29/2021

Date

5

# EXHIBIT A

## JOB DESCRIPTION: SENIOR PORTFOLIO MANAGER

**Reports to:** Director of Investment Operations         **Job Status Classification:** Exempt

**Job Summary:**

This position is responsible for supervising and supporting the portfolio operations team and resolving escalated issues for high net worth clients and intermediaries. It involves heavy interaction with client service teams and asset management firms as well as a high volume of electronic and telephone communication. The Senior Portfolio Manager must be comfortable with high levels of responsibility, be able to both lead and inspire confidence as well as collaborate and effectively interact as a team member. This is a fast-paced, deadline-oriented position that requires diplomacy and professionalism.

**Essential Job Functions for the Senior Portfolio Manager will include:**

- Supervising the portfolio operations team, delegating and overseeing investment account servicing related to asset allocation implementations and changes, external investment managers, and third-party trading platforms
- Responding to and resolving escalated asset management issues such as platform configuration and trading decisions working with various internal departments and outside business partners
- Establishing and maintaining procedures and service standards related to portfolio operations including identifying and implementing the most efficient processes
- Acting as project manager for assigned projects such as evaluating and implementation of new asset management platforms and looking at workflow processes that drive the department towards greater efficiency; responsible for creating, adapting and implementing action plans
- Facilitating strong relationships with investment management partners as point of contact for service team managers
- Providing education and assistance to client service teams related to third-party investment managers and platforms
- Collaborating with other operations teams supporting asset allocation trades, initial account funding, distribution requests, and systematic withdrawals
- Working closely with the Compliance department by implementing compliance standards, educating client service teams on such and escalating any requests outside of this standard
- Interviewing candidates as well as ensuring appropriate training and advancement of each team member
- Performing other duties assigned as needed

**Required Knowledge, Skills and Abilities:**

- Associate's degree required
    - Bachelor's degree from an accredited institution strongly preferred (preferably Business, Economics, Accounting or Finance related)
- 3 years of financial services or related experience required
- Prior supervisory experience preferred
- Excellent communications skills with a strong ability to prioritize, multi-task and troubleshoot
- Series 65 license required; if not licensed upon hire, required to obtain per company guidelines

*The Senior Portfolio Manager job description is not designed to cover or contain a comprehensive listing of activities, duties, or responsibilities that are required of the employee.*

                                                                                              ____ Employee Initials

# EXHIBIT B

## COMPENSATION: SENIOR PORTFOLIO MANAGER

A. Base Compensation: Employee shall receive a salary equivalent to $100,000 gross, per year, payable twice monthly in installments of approximately $4,166.67 less all applicable withholdings. Notwithstanding anything herein to the contrary, Employer reserves the right to modify its payroll practices at any time, in its sole discretion.

B. Quarterly Incentive Compensation: Each calendar quarter, Employee is entitled to receive "Quarterly Incentive Compensation" calculated as follows: (i) sixty percent (60%) of Net Revenues collected during such calendar quarter from those clients for which Employee is primarily responsible, *minus* (ii) $25,000. "Net Revenues" means all fees paid by clients less any referral fees paid by Employer to referral partners (including custodial referral partners and those employees of Employer who receive commissions for client referrals). The Quarterly Incentive Compensation will be calculated and paid to Employee on a quarterly basis; provided, however, that should Employee's employment be terminated during any calendar quarter, any Quarterly Incentive Compensation shall be prorated accordingly for such calendar quarter.

C. Commission-Based Business: No later than the fifteenth (15th) of each month, Employee shall submit a statement generated by each broker-dealer transmitting the Commission-Based Business Revenue (as defined in the Asset Purchase Agreement, by and between ACG Wealth, Inc., Jeffery T. Shaver, Joseph P. Young, David Y. Millican, and Employer (the "APA")) and Commission-Based Business Net Revenue (as defined in the APA) to Employee (each, a "Statement") setting forth the Commission-Based Business Revenue and Commission-Based Business Net Revenue received by Employee in the prior calendar month, and the Accumulated Commission-Based Expenses (as defined in the APA) incurred by Employee in the prior month. Installments of Employee's compensation (gross base salary and/or Quarterly Incentive Compensation, at the election of Employer) received by Employee shall be reduced by the amounts of any Commission-Based Business Net Revenues set forth in the Statement, until the aggregate reductions of total compensation are equal to such Commission-Based Business Net Revenues. Employer shall reimburse Employee for all Accumulated Commission-Based Expenses set forth in the Statement.

D. Full Time Employment: Employee acknowledges that she is a full-time employee of Employer and that Employee will abide by Employer's standard office hours which are currently from 8:00 AM to 5:00 PM Monday through Friday.

E. Allowed Time Off (ATO): Vacation or sick leave will not be accrued. Employee will be permitted to take a reasonable amount of paid time off, provided that client commitments as outlined in their compensation plans are met; administrative responsibilities such as, but not limited to, company training meetings are met; and time off is approved in advance with the assigned Managing Director.

F. Holidays: In addition to ATO, Employee will receive a total of thirteen (13) paid holidays per year; pro-rated from Employee's Start Date for 2021. A holiday calendar is published each year and distributed to employees.

G. Benefits: Employee will be eligible to participate in Employer's employee benefit programs, subject to the terms, conditions, and limitations governing those programs. These employee benefit programs may include Employer's retirement, medical, vision, dental, and life insurance programs. Employer reserves the right, in its sole discretion, to add to, delete from, amend, or terminate at any time any or all of Employer's employee benefit programs.

H. Licensing Guidelines: Employee acknowledges that he is properly licensed and/or credentialed to become registered as an IAR or will adhere to the following guidelines to become licensed. Properly licensed and/or credentialed is defined as having a Series 65 or Series 66 license, or holding a qualified credential that excludes him/her from having to pass the Series 65 licensing examination. Those credentials are: CERTIFIED FINANCIAL PLANNER™ (CFP®); Chartered Financial Consultant (ChFC); Personal Financial Specialist (PFS); Chartered Financial Analyst (CFA); or Chartered Investment Counselor (CIC).