The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

**Stenographic Reporter note:**

**No AI technology was used in the preparation of the**

**Official Certified U.S. District Court Transcript**

1

<pre>
                    UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION


MERCER GLOBAL ADVISORS,              )      Docket Number
                                     )      1:25-CV-2523-SDG
                                     )
                     Plaintiff,      )
                                     )
              v.                     )
                                     )      Atlanta, Georgia
                                     )      February 19, 2026
UNIFIED INVESTMENT MANAGEMENT,       )
LLC, et al.                          )
                                     )
                     Defendants.     )


                   TRANSCRIPT OF TELECONFERENCE
             BEFORE THE HONORABLE STEVEN D. GRIMBERG
                  UNITED STATES DISTRICT JUDGE
</pre>

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:            MR. SHANE NICHOLS
                             MS. JODI BENASSI

FOR THE DEFENDANTS:          MS. SAMANTHA MANDELL

OFFICIAL COURT REPORTER:     ALICIA B. BAGLEY, RMR, CRR

Proceedings recorded by mechanical stenography, transcript produced by computer

P R O C E E D I N G S

(in Atlanta, Fulton County, Georgia; February 19, 2026;

all parties by teleconference)

THE COURT:  All right.  Let me call the case.  This is Mercer Global Advisors vs. Unified Investment Management, et al.  Case Number 25-CV-2523.  Let's have appearances of counsel beginning with the plaintiff.

MR. NICHOLS:  Thank you, Your Honor.  It's Shane Nichols for Mercer Global Advisors along with my partner Jodi Benassi.

THE COURT:  Good afternoon.  Good to see you.

MS. MANDELL:  This is Samantha Mandell on behalf of defendants.

THE COURT:  Okay.  Good to see you as well.

All right.  I called this Zoom conference after receiving the parties' joint preliminary report which identified some issues and requested a conference.  So I guess let's start -- I'll start with you, Mr. Nichols, if you could just sort of give us an update on where things lie at the moment.

MR. NICHOLS:  Sure.  I think the simplest disagreement we're having, Your Honor, is over the discovery period of four months versus two months.  I think four months is the standard track and our position is that we should take -- we should have four months.  I believe -- obviously, I'll let Ms. Mandell speak for her client, but I think that the two months is based on the fact that we had a related case in state court and that case didn't get anywhere.  We

had a lot of problems with discovery in that case and so I don't think that two months is a realistic timeframe in which to get discovery and also resolve any discovery issues that might taint this case the way it did in state court and so I think --

THE COURT:  Right.

MR. NICHOLS:  That's our first issue.

THE COURT:  Well, from what I understand, it goes hand-in-hand with sort of what we're going to incorporate from the state case and whether there will be followup discovery or not.  I think that's probably -- I imagine that's what Ms. Mandell is getting at in terms of the timing.  So what's your position on that?

MR. NICHOLS:  Right.  So what was produced in the state court case was the problem that led to filing two motions to compel in state court that were never resolved and so, you know, I don't -- we've spoken to opposing counsel.  I don't see any indication that they are willing to produce more documents that they've already produced and so I don't think that we're going to get anywhere on the discovery issues which means that, you know, we're left with -- what they produced in that case is about 300 documents, less than 50 of which are what we would consider substantive.  Most of the rest of them were self-serving attestations by clients, that sort of thing, not really discovery.  Out of that, a total of 15 emails.

And this is a case, Your Honor, about whether the defendants solicited clients through communications with the clients and so there's no way that there's only 15 emails that are relevant to this

case.  There's probably hundreds or maybe thousands of emails relative to this case that we haven't gotten yet.

Just as an example, there are something like 70 clients that these guys took from my client through, we allege, improper solicitation through all these communications and the emails that have been produced pertain to only 9 clients, 9 of those 70 plus clients, so there's no question there's a lot of missing documents in the case, Your Honor.

So even if we adopt the record from the lower court -- I'm sorry, from the state court -- and I don't think there's any -- there's no -- there's nothing controversial about the deposition transcripts and the interrogatory responses because those are all sworn statements.  The only question here is whether we can get more documents from the defendants and I think that's going to be -- it's going -- we're going to depend on the defendants to either do the right thing or we're going to be back in front of Your Honor with motions to compel.

THE COURT:  Okay.  Ms. Mandell.

MS. MANDELL:  Sure, Your Honor.

Obviously, I dispute most of Mr. Nichols' position about what was done in state court.  We went through over a year of discovery. It wasn't until extraordinarily late in the game that after -- I mean, I think discovery was technically done that Mercer came back and asked us to run all these new -- do a whole round of electronic discovery that has not been implemented.

So we ran all the search terms that I've set forth in the order.  We've produced everything that we -- all the hits from that that were responsive and sort of the -- everything responsive that -- so there's nothing that I've produced shows solicitation, ergo, I must have not done a full discovery.  Summary judgment was fully briefed.  They got what we had on our search.  So that's sort of my position.

My secondary alternative position is that we already did this.  We spent a year.  My clients' spent a tremendous amount of money going back to the well and digging stuff up and producing things.  In that first case there was no e-discovery protocol, there was no request for, you know, us to use a vendor and pull all this metadata, etcetera, etcetera.

Having gone through that now to be -- for my clients to be required to do it again a different way -- you know, these days the expense of e-discovery the magnitude that is being requested for a case where there's a de minimus number of documents that are actually relevant or responsive is exorbitant and when all you're going to get out of it is some meeting with metadata that has not been shown to be relevant to the claims here.

And to be sure, I've offered -- you know, if there's a document as to which authenticity is disputed, etcetera, etcetera, I'm happy to go back to the well and try to dig that needle out of the haystack.  But to require us to redo everything just to reproduce it is disproportionate, in our view, and at an absolute minimum we think

if Mercer is insisting upon that that they should shoulder the cost of that.

THE COURT:  All right.  Can you give me the history.  What is the connection to the previous state case?  Is this a renewal action or why are we back here?

MS. MANDELL:  Yes.  It was dismissed voluntarily after summary judgment was fully briefed and we were waiting for the decision below -- or in the trial court in the state court.

THE COURT:  Okay.  Mr. Nichols, can you share what was the reason for that?

MR. NICHOLS:  The judge in the state court case, Your Honor, had the largest RICO case ever tried in Georgia in front of her and never ruled on a single thing that was filed.  I'm not picking on the judge.  I'm just saying there was no way they were ever going to get to our case and so we voluntarily dismissed it.  That was disputed by the other side.  The judge came back and said, no, they're fine, it's voluntarily dismissed without prejudice.  You can go on -- move on to the federal court, which we did.  They filed motions to dismiss.

I just want to point out that the very discovery issues that Ms. Mandell is referring to are raised in detail in our two motions to compel that were filed in state court and never addressed.  If Ms. Mandell's position is that we're not getting anything more out of them, which is what I hear, then I would propose that we're -- that the judge -- that the Court enable us to just file those motions to compel as soon as discovery's open, which is March 2nd, and we can

just open the discovery with those issues.  I would rather not do it that way.  I'd rather do it where we get regular discovery, take depositions the regular way, but it doesn't sound like that's where the defendants are sitting.

THE COURT:  Well, it seems to me we have two options.  Either we take up those motions to compel that were pending before and I would resolve those in the way I resolve it and that's the discovery that you have and then we can move on or we don't and then plaintiff has a chance to serve more discovery.  Which do you prefer, Ms. Mandell?  Do you prefer to resolve the outstanding discovery issues but otherwise not have any additional discovery?

MS. MANDELL:  I think I'm agreeable to that.  I'm a little bit flatfooted.  But honestly, those motions were never filed.  They were sent to the court -- or maybe they were filed, but they weren't, you know, through the gatekeeping stuff before the summary judgment was done down there.  I frankly haven't looked at them in eight months and so without the ability to refresh myself, I'm a little bit reluctant to commit.  But I don't, off the bat, see an issue with that that I can think of.  So just to clarify --

THE COURT:  I'm sorry.  Go ahead.

MS. MANDELL:  It would be that they would -- they file what they filed or sent below, I would respond, you would decide, and then if you decided discovery was sufficient then we'd be at the summary judgment gate again?

THE COURT:  Well, the procedure would be a little different

just because of the way I handle discovery disputes.  Under my standing order discovery disputes are handled like this call.  We would have a discovery conference by Zoom and I would resolve the discovery issues that way instead of briefing, at least as an initial matter -- sometimes I ask for briefing, but that's rare.  So that's how we would handle it.

It sounds like -- Mr. Nichols, it sounds like that's the only discovery that you're needing; is that right?

MR. NICHOLS:  Right.  Well, I mean, I just -- I don't want to mislead the Court.  It's very far-reaching.  So when you say that's the only discovery that we're looking for -- we're looking for something on the order of hundreds of thousands of emails between them and clients and we got 15.  So, you know, I don't want to undersell it.  But, yes, that is -- we would love to have the judge-- have Your Honor review this and give us a determination right off the bat on our motions to compel that were pending in state court.

MS. MANDELL:  I'm okay with that, Your Honor.

THE COURT:  That seems like the most efficient thing to do.  I mean, in terms of like let's -- you know, saving resources and not retreading over the same ground, let's just resolve what was outstanding and then move on.

MS. MANDELL:  That works for me.

MR. NICHOLS:  That would be great.  Thank you, Your Honor.

THE COURT:  So here's what I'm going to ask you to do, then.  I'm going to ask the two of you to confer about those outstanding

discovery issues -- and not just by email, but by either telephone call or virtual conference -- and see if you can at least narrow the issues for me; okay?

MR. NICHOLS:  Yes, Your Honor.

THE COURT:  Once you have exhausted those efforts then, Mr. Nichols, I'd like you to submit a written discovery dispute statement by email to Ms. Brye.  Check my standing order and you'll see the instructions on how to do that.

MR. NICHOLS:  Works for me.

THE COURT:  Once we receive that, we'll schedule a conference like this one.  Ms. Mandell, you'll have a deadline teed off of that conference to file a written response.  The intent of those are to be a short statement like around three pages just to give me, you know, a 10,000-foot level of what the issue is and then we have these conferences.  Again, to avoid a motions practice.

MR. NICHOLS:  Thanks, Your Honor.

THE COURT:  All right.  So how long do you need to have that conference?

MR. NICHOLS:  I think we could probably be done with that by the time that discovery is set to open, which is March 2nd.  I mean, we could do it even faster, but I think that would probably be a reasonable amount of time.

MS. MANDELL:  That's fine with me with -- just to clarify.  That would mean that we would postpone discovery until after this has taken place?

THE COURT:  Yeah.  There's going to be no discovery outside of resolving these issues.

MS. MANDELL:  Okay.  That works for me.

THE COURT:  Okay.  So I'll order counsel to do that by March 2nd and maybe you'll surprise me and come to an agreement.  If not, Mr. Nichols, then from there submit your statement and we'll go ahead and get a conference scheduled.

MR. NICHOLS:  Will do, Your Honor.

I did want to raise a couple issues that are related to this, but I'll wait until you're ready for it, obviously.

THE COURT:  Is that all on the discovery front --

MR. NICHOLS:  Well, no.

THE COURT:  -- on that topic that we were just discussing?

MR. NICHOLS:  I've got a couple related discovery issues that I think we need to talk about that I want to raise it now, if I can.

We've got also some disputes that are in our report that we've submitted to the Court related to a metadata and ESI and the bottom line is -- what happened in the state court case is that the defendants themselves collected documents from their own devices and, you know, the Eleventh Circuit's pretty clear that, you know, you need to have attorney supervision at the very least.

The Eleventh Circuit has also -- lesser courts also consider a trade secret case like this one to be special in that the computers that are in question are the very instruments -- instrumentalities that are accused of processing, storing, transferring, and

communicating the trade secrets at issue. So we really think that this ought to be done through a third-party vendor rather than by the parties themselves and so we would like -- we would include that in our motion, of course, if we can't come to an agreement on it, but I do want to raise that because it affects discovery in this case. Whether we address it through a motion or subsequently, you know, I'd like to get some direction from the Court so that the parties -- when we go to meet and confer about this issue we know where the Court stands on it.

The bottom line is we -- you know, like I said, we got 15 total emails from the defendants. I asked the defendants in their depositions did you search for emails? One of them said he didn't even search amongst his emails for documents in the case.

So, you know, we'll cover all that in our motions, if we have to, but I'd like some direction from the Court, if we can get it, around electronic discovery and the requirement of metadata. We think there ought to be metadata for any document that has metadata. Defendants are taking the position in this case that a flat PDF file is sufficient and we don't think that's consistent with Eleventh Circuit law.

THE COURT: Have these accounts been preserved?

MS. MANDELL: Yes, sir.

MR. NICHOLS: We hope so.

THE COURT: Okay. All right. Ms. Mandell, what's your response to that?

MS. MANDELL:  Well, I disagree.  It seems a little bit putting the cart before the proverbial horse to discuss the ESI protocol before determining whether discovery should be had in the first instance.

But to touch on it as much as the Court would like to hear from me now is that the -- I disagree with Mr. Nichols.  We directed searches through all electronic devices of targeted search terms, they're all set forth in the 26(f) report, as well as pulling out specifically identified documents and gathering -- yeah, my clients gathered documents, we did not use a vendor, which in a case of this size is far from unusual.

But my larger point - and this is what I touched on earlier - is that this extensive metadata protocol and objection to PDF is raised after a year of discovery took place.  If there is an issue, it should have been day one in state court so that we could going forward, you know, either meet whatever undisclosed standards are now trying to be imposed.  But to require us to go back to the well and do everything over only to pull metadata that, you know, in a very rare case is highly probative -- here, I don't see that at all.  But also just the exorbitant expense on top of what has already been incurred to go back and redo discovery only to pull the same documents with some embedded metadata doesn't seem proportional to me.

THE COURT:  Okay.  Well, it does seem to me that this goes hand-in-hand with the discovery issues themselves and so I'll ask you

all to confer about this piece of it as well.

I will say, though, just based on my experience with these issues that I am skeptical of any procedure that allows the custodian himself or herself to do their own searches.  That's created a lot of issues in the past.  So as you're discussing this you should know that I would much prefer a process that includes a professional -- it doesn't necessarily need to be a third-party vendor, but at least an in-house IT professional handling those electronics and downloading the relevant documents rather than leaving it to the abilities or inabilities of any particular custodian.

MS. MANDELL:  And to be sure, Your Honor, it wasn't solely -- we pulled from the Google Enterprise system that allows you to pull everything that hit on search terms.

THE COURT:  Who was doing that?

MS. MANDELL:  My clients did that but did it through the Enterprise business platform that allows for e-discovery pulls.  I've got the full file of all the DAT files so that I have their entire email box up in my Outlook.

THE COURT:  Okay.

MR. NICHOLS:  Can I say something about that, Your Honor?

THE COURT:  Sure.

MR. NICHOLS:  I just want to say a couple things.  First of all, you know, talking about this being a case of this size suggests that it's small.  These guys have taken $150 million in AUM from my client which is generating for them about $2 million of revenue a

year.  This may be a small case for Ms. Mandell.  It's not a small case to my client.

But, you know, they spent a year of discovery, but the depositions of the principals parties in the case, they said they pulled these documents themselves without any supervision.  So, you know, it may be that some of them were pulled with supervision, but that's not what the defendants are saying in this case.

Also, this is a case about whether the defendants communicated with clients when they shouldn't have and so the email communications between them, text messages, everything is relevant in this -- highly relevant in this case and the metadata is highly relevant because we have to establish when those documents were stored, where they were stored.

I'm not talking about this case in particular, we handle a lot of cases for Mercer, a lot of times what you have is a client list that's stored at Mercer and then later it's stored at the new company in this case they've started.  The metadata is critical to proving that that's the same document and that it was stored in both places before and then after the party left Mercer.  So these are not just burdensome quirks.  These are super important in a trade secret case.

THE COURT:  Okay.  I understand -- and, Ms. Mandell, I will say I do tend to agree with Mr. Nichols that the forensics on these searches are very important in these types of cases.  So just keep that in mind when you're negotiating a potential resolution to that.

MS. MANDELL:  Yes, sir.

15

THE COURT:  All right.  So with that, I will leave it to you to work this all out.

MR. NICHOLS:  Thank you, Your Honor.

THE COURT:  Okay.  Otherwise, we'll be in touch again.  All right.

MR. NICHOLS:  All right.  Thanks.

THE COURT:  We're in recess.

(Proceedings concluded at 2:25 p.m.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

CERTIFICATE OF REPORTER


        I do hereby certify that the foregoing pages are a true

and correct transcript of the proceedings taken down by me in the

case aforesaid.



                        This the 27th day of February, 2026.




                                /S/ Alicia B. Bagley _____
                                ALICIA B. BAGLEY, RMR, CRR
                                OFFICIAL COURT REPORTER
                                (706) 378-4017